1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                        SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| JENNIFER A,[1]<br><br>                Plaintiff,<br><br>v.<br><br>MARTIN O'MALLEY,[2] Commissioner<br>of the Social Security Administration,<br><br>                Defendant. | Case No.:  23cv326-GPC(LR)<br><br>**REPORT AND<br>RECOMMENDATION<br>REGARDING<br>JOINT MOTION FOR JUDICIAL<br>REVIEW**<br><br>**[ECF No. 14]** |

        This Report and Recommendation is submitted to the Honorable Gonzalo P.
Curiel, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local
Rule 72.1(c) of the United States District Court for the Southern District of California.
On February 17, 2023, Plaintiff Jennifer Allen ("Plaintiff") filed a Complaint pursuant to
42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social

---

[1] In the interest of privacy, this Order uses only the first name and the initial of the last name of the non-government party or parties in this case.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

[2] Plaintiff named Kilolo Kijakazi, who was the Acting Commissioner of Social Security when she filed her Complaint on February 12, 2023, as a Defendant in this action.  (See ECF No. 1 at 1.)  Martin O'Malley is now the Commissioner of Social Security, and he is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

Security ("Defendant") denying Plaintiff's application for a period of disability and disability insurance benefits.  (See Compl., ECF No. 1.)

Now pending before the Court is the parties' Joint Motion for Judicial Review. (See J. Mot. Judicial Review, ECF No. 14 ("J. Mot.").)  For the reasons set forth below, the Court **RECOMMENDS** that the Commissioner's decision be **REVERSED**, and this matter be **REMANDED** for further administrative proceedings consistent with this Report and Recommendation.

## I.  PROCEDURAL BACKGROUND

On October 2, 2020, Plaintiff filed her first application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability beginning on February 14, 2020.  (See ECF No. 8 ("AR")[3] at 179-180.)  After her application was denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Id. at 112.)  On January 14, 2022, a hearing regarding Plaintiff's application was held before ALJ Kevin Messer, during which Plaintiff was represented by counsel.  (See id. at 31-59.)  A vocational expert ("VE") was also present at the hearing.  (See id.)  On February 8, 2022, ALJ Messer determined that Plaintiff was not disabled since February 14, 2020, the alleged onset date of her disability.  (See id. at 25.)  On April 7, 2022, Plaintiff requested that the Appeals Council review the ALJ's decision.  (See id. at 176-77.)

On December 29, 2022, the Appeals Council denied Plaintiff's request to review the ALJ's decision.  (See id. at 1-3.)  Plaintiff filed the instant civil action on February 17, 2023.  (See Compl., ECF No. 1.)

## II.  THE SEQUENTIAL DISABILITY PROCESS

The initial burden of proof rests upon the claimant to establish disability.  See

---

[3] "AR" refers to the Administrative Record filed on April 18, 2023.  (See ECF No. 8.)  The Court's citations to the AR in this Report and Recommendation are to the pages listed on the original document rather than the page numbers generated by the CM/ECF filing system.  For all other documents, the Court's citations are to the page numbers affixed by CM/ECF.

Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986).  To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step process for determining whether a person is disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.  At the first step of the five-step sequential evaluation process, the ALJ must determine if a claimant is engaged in "substantial gainful activity"; if so, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At the second step, the ALJ must determine whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted or is expected to last for a continuous period of at least 12 months; if not, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); see also 20 C.F.R. §§ 404.1509, 416.909.  At the third step, the ALJ must determine if the claimant's impairment(s) meets or equals that of a listed impairment; if so, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At the fourth step, the ALJ must determine whether, based on the claimant's residual functional capacity, the claimant can perform his or her past relevant work; if so, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At the fifth step, the ALJ must determine whether, based on the claimant's residual functional capacity, age, education, and work experience, the claimant can make an adjustment to other work; if so, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.    SUMMARY OF THE ALJ'S FINDINGS

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 14, 2020, the alleged onset date of her disability.  (See AR at 17.) At step two, the ALJ found that Plaintiff had the following severe impairments: displaced fracture of the right shoulder in 2018 status post open reduction and internal fixation; unspecified neurocognitive disorder; borderline intellectual functioning; anxiety disorder;

and depression.  (See id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  Next, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to do the following:

> Perform medium work as defined in 20 CFR 404.1567(c), specifically as follows: can lift and/or carry 50 pounds occasionally and 25 pounds frequently; can stand and/or walk for 6 hours out of an 8-hour workday with regular breaks; can sit for 6 hours out of an 8-hour workday with regular breaks; can frequently reach overhead with the dominant right upper extremity; can understand, remember, and carry out simple routine tasks: can occasionally interact with the general public; can occasionally perform work-related, non-personal, non-social interaction with coworkers and supervisors; and is limited to jobs requiring only simple work-related decisions however can keep pace sufficient to complete tasks and meet quotas typically found in unskilled work.

(Id. at 19-20.)

At step four, the ALJ accepted and cited the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC would be unable to perform her past relevant work.  (See id. at 24.)  The ALJ then proceeded to step five of the sequential evaluation process.  (See id.)  Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could make a successful adjustment to other work that exists in significant numbers in the national economy, the ALJ found that Plaintiff was not disabled.  (See id. at 25.)

In determining that Plaintiff did not have an impairment or combination of impairments that met the severity of one of the impairments listed in the Commissioner's Listing of Impairments at step three, the ALJ considered both the Paragraph B and Paragraph C criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A)(2)(b) & (c), which assess a claimant's mental functioning in a work setting. (See id. at 18-19.)

4

Additionally, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Id. at 20.)  The ALJ cited several medical opinions, as well as other evidence in the record to determine Plaintiff's RFC.  (See id. at 20-23.)

## IV.    DISPUTED ISSUES

As reflected in the parties' Joint Motion, Plaintiff raises the following issues as the grounds for reversal:

1.    Whether the ALJ properly developed the record with respect to Plaintiff's IQ scores at step three.  (See J. Mot. at 4:7-11 ("Here the ALJ missed the IQ score in the neuropsychological evaluation which establishes [Plaintiff's] IQ score at 67.  The ALJ uses the CE report which finds the FISQ at [72] . . . As such, the ALJ's failure to address the discrepancy constitutes a failure to develop the record."); id. at 9:5-6 ("To the extent that these physicians' examinations findings conflicted, it was for the ALJ to resolve any conflict.").)

2.    Whether the ALJ adequately addressed the paragraph C criteria of the Commissioner's Listing of Impairments at step three.  (See id. at 15:13-26 ("The ALJ did not provide any explanation beyond boiler plate language to explain why [Plaintiff's] psychiatric background does not meet paragraph C.  As such, the ALJ did not address paragraph C as to [Plaintiff's] case.  Therefore, the ALJ's findings are not supported by substantial evidence."); id. at 15:3-5 ("substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairments did not satisfy the paragraph C criteria.").)

3.    Whether the ALJ properly addressed Plaintiff's impairments in formulating her RFC.  (See id. at 20 ("Because [Plaintiff] has a mental and physical limitation her RFC must include the combination of impairments in the [RFC].  The ALJ did not address the difficulty [Plaintiff] has functioning.  The ALJ did not provide a RFC which includes the effects of those impairments."); id. ("Plaintiff fails to identify any reversible

error in the ALJ's assessment of mental and social limitations.").)

4.      Whether the ALJ provided clear and convincing evidence in evaluating Plaintiff's subjective symptom testimony.  (See id. at 21 ("The ALJ has not provided clear and convincing reasons to find [Plaintiff's] statements not persuasive."); id. at 28 ("the objective medical evidence, Plaintiff's treatment regimen, and her admitted activities undermined her subjective complaints").)

## V.      STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012), superseded by regulation on other grounds.

The Court must affirm the Commissioner's decision if it is "supported by substantial evidence and based on the application of correct legal standards."  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (per curiam).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  Substantial evidence means "more than a mere scintilla but less than a preponderance."  Id.  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "weigh both the evidence that supports and the evidence that detracts from the ALJ's factual conclusions."  Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 523 (9th Cir. 2014) (internal quotation omitted).  When evidence is "susceptible to more than one rational interpretation, one of which supports the ALJ's decision," the Court must uphold the ALJ's conclusion.  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  The Court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely."  Revels v. Berryhill, 874. F.3d 648, 654 (9th Cir. 2017) (internal quotation omitted).

Error in a social security determination is subject to a harmless-error analysis. Ludwig v. Astrue, 681 F.3d 1047, 1054 (9th Cir. 2012). "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the ALJ's ultimate conclusion." Molina, 674 F.3d at 1115 (internal quotation omitted). The Court must "look at the record as a whole to determine whether the error alters the outcome of the case." Id. An error that is "inconsequential to the ultimate nondisability determination" is harmless. Id. (internal quotation omitted).

## VI. DISCUSSION

### A.   The ALJ's Discussion of Plaintiff's IQ Scores at Step Three

#### 1.   Parties' arguments

Plaintiff argues that the ALJ failed to properly develop the record with respect to her IQ scores at step three. (See J. Mot. at 5.) Specifically, Plaintiff contends that the ALJ improperly ignored an August 2020 IQ test performed by psychologist Lori Alasantro, Ph.D., which evaluated a full scale IQ ("FSIQ") score of 67, in favor of a February 2021 IQ test performed by an agency consultative examiner, Adrienne Pasek, Psy.D., which evaluated an FSIQ score of 72. (See id. at 6-7.) Although not explicitly discussed in Plaintiff's arguments, the distinction between these two scores is important because the listing for Intellectual Disability—an impairment provided for in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05 ("Listing 12.05"), which the ALJ did not address in his decision, requires in pertinent part a "full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence." Plaintiff contends that the ALJ's implicit rejection of the FSIQ score evaluated by Dr. Alasantro's evaluation in favor of Dr. Pasek's, without any attempt to address the discrepancy between the two scores constitutes a failure to develop the record. (See id. at 5.) Under Plaintiff's arguments, had Dr. Alasantro's opinion been properly credited, the ALJ would have been required to evaluate whether Plaintiff met or equaled the requirements for an intellectual disability under Listing 12.05. (See id. at 6-7.)

In response, Defendant argues that the ALJ was neither required to consider the

discrepancy between the two IQ tests, nor to address Listing 12.05 in his decision.  (See id. at 9-10).  Contending that the ALJ properly relied on Dr. Pasek's opinion as the "most recent and . . . programmatically acceptable" test in the record, Defendant asserts that "[t]o the extent that these physicians' examination findings conflicted, it was for the ALJ to resolve any conflict."  (Id. at 8-9).  As for the ALJ's purported failure to address Listing 12.05, Defendant argues that the ALJ need not state why a claimant fails to satisfy every section of the listing of impairments.  (See id. at 9-10.)  Rather, Defendant contends that Dr. Pasek's FSIQ score of 72 precludes Plaintiff from meeting her burden of proving that she met or equaled the requirements of Listing 12.05.  (See id. at 10.)

## 2.   Relevant Factual Background

Examination notes by Tecca Blankfeld, a school psychologist, when Plaintiff was three years old in 1982 explain that Plaintiff developed an infection as an infant, which resulted in Kinsbourne syndrome when she was thirteen months old.  (See AR at 288.) Plaintiff's Kinsbourne syndrome resulted in a regression of her fine motor control, but slowly subsided after she was prescribed Prednisone when she was fifteen months old. (See id.)  In January 1985, Plaintiff was re-evaluated by Psychologist Thomas Petersen, Ph.D, who found Plaintiff to be "operating within the average ranges in both verbal and nonverbal functioning . . . [s]he has extremely strong strengths in reasoning skills and  . . . deficits in visual motor speed and accuracy."  (Id. at 298.)

In March 2001, Thomas Scheweiller, M.D., a neurologist, opined that Plaintiff "has what might best be described as developmental Gerstmann's syndrome" because of her "great difficulty with organizational skills, mathematical skills, and visual spatial functioning."  (Id. at 275.)  He relayed that Plaintiff's contemporaneous complaints were communication difficulties, and problems reasoning and using common sense.  (See id.) Dr. Scheweiller noted in his evaluation that Plaintiff "has difficulty with math, particularly counting money" and felt uncomfortable driving.  (Id.)

There is a lengthy gap in the record before the next formal evaluation of Plaintiff's mental capacity or intellectual function testing.  On August 25, 2020, Plaintiff was

referred to clinical neuropsychologist Lori Alasantro, Ph.D., to establish a cognitive profile in the context of a job placement referral.  (Id. 272-73.)  Dr. Alasantro reported that Plaintiff presented with neurocognitive complaints relating to attention and multitasking and psychiatric complaints relating to depression and anxiety.  (See id. at 273.)  During the interviews, Plaintiff denied "major problems with cognition" any physical pain, or symptoms of mania and compulsivity.  (Id. at 273.)  Because Plaintiff "demonstrated impaired performances greater than expected . . . on tests of broad intellectual abilities, attention, language, visuospatial abilities, executive function, and visual memory" and "noted a long-standing history of behavioral problems . . . in the work setting," however, Dr. Alasantro determined that Plaintiff "currently meets the criteria for unspecified neurocognitive disorder."  (Id. at 274.)  During the examination, Plaintiff was normally oriented, aware, groomed, had a tearful and irritable affect, was cooperative, had adequate responses to nonverbal communication, and was rational, coherent, and logical.  (See id. at 277-78.)  Dr. Alasantro noted that Plaintiff's mother described her as "very smart in many areas but struggles with others," including emotions and common sense.  (Id. at 273.)  The examination noted that Plaintiff had intact activities of daily living, but mixed instrumental activities of daily living because she did not drive and did not independently manage her finances.  (See id.)  Dr. Alasantro noted that as a schoolchild, Plaintiff had had a "formal diagnosis with a learning disability" was "in resource classes where she received extra help" and "received extensive occupational therapy, physical therapy, and speech therapy."  (Id.)  Importantly to this case, Dr. Alasantro administered a Wechsler Adult Intelligence Test—Fourth Edition ("WAIS-4"), which gave Plaintiff an indexed FSIQ of 67.  (Id. 280.)

On February 9, 2021, an agency appointed consultative examiner, Adrienne Pasek, Psy.D., conducted a complete psychological evaluation of Plaintiff.  (See id. at 394.)  Dr. Pasek reported that Plaintiff independently dressed, bathed, managed medication, and completed household tasks.  (See id. at 396.)  Dr. Pasek also noted that Plaintiff was able to handle her finances, although she would ask her grandmother for some support with

handling money.  (See id.)  According to Dr. Pasek, Plaintiff behaved appropriately, was alert and oriented, had spontaneous and fluent speech, had appropriate mood and affect, had normal, logical and coherent thought content, an unimpaired memory and attention span, and had appropriate insight, judgment, and knowledge.  (See id. at 397.)  Dr. Pasek administered a WAIS-4 examination to Plaintiff, which resulted in an FSIQ score of 72, including a verbal comprehension measure of 85.  (See id. at 398.)  Noting that Plaintiff's "overall cognitive ability is likely borderline to low average," Dr. Pasek explained that Plaintiff's "allegations appear to be substantiated for an anxiety disorder.  However, from a purely psychological perspective, the claimant appears to be capable of employment with the appropriate interventions, accommodations, and supervision."  (Id. at 400.)  Dr. Pasek found that Plaintiff had no impairment in understanding, remembering, and carrying out short and simplistic visual and verbal instructions, as well as no impairment with complex and detailed visual and verbal instructions with appropriate support.  (See id. at 401.)  Plaintiff "demonstrat[ed] no impairment in handling complex work-related decisions with the appropriate support accommodations, interventions, and supervision" and "would be able to interact appropriately with supervisors, coworkers, and peers, with the appropriate support accommodations, interventions, and supervision."  (Id.)  Dr. Pasek diagnosed Plaintiff with "Unspecified Anxiety Disorder."  (Id. at 400.)

### 3.    Applicable law

#### a.    General duty to develop the record

Although a claimant is ultimately responsible for providing sufficient medical evidence of a disabling impairment, "the ALJ has a special duty to develop the record fully and fairly and ensure that the claimant's interests are considered, even when the claimant is represented by counsel."  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  This responsibility "rests with the ALJ in part because disability hearings are inquisitorial rather than adversarial in nature."  Loeks v. Astrue, Civil No. 09–1435–HA, 2011 WL 198146, at *5 (D. Or. Jan. 18, 2011) (citing Sims v. Apfel, 530 U.S. 103, 110-

11 (2000)).  "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."  <u>Sims</u>, 530 U.S. at 111.

### b.   The step three analysis

At step three, the ALJ considers whether one or more of the claimant's impairments meets or equals a listed impairment identified in 20 C.F.R. Pt. 404, Subpart P, Appendix 1.  <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If a claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is presumed disabled.  <u>See</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 512 (9th Cir. 2001).  "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment."  <u>Jessica B. v. Comm'r of Soc. Sec.</u>, No. 1:18-CV-3074-TOR, 2019 WL 850954, at *4 (E.D. Wash. Jan. 30, 2019) (quoting <u>Lewis</u>, 236 F.3d at 512) (internal quotations omitted).  "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment," and "[a] boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so."  <u>Lewis</u>, 236 F.3d at 512 (citing <u>Marcia v. Sullivan</u>, 900 F.2d 172, 176 (9th Cir. 1990)).  An ALJ need not, however, state why a claimant failed to satisfy every different section of the listing of impairments where the factual support for his conclusion can be deduced from other discussions of the medical evidence in other parts of the ALJ's decision.  <u>See</u> <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1200-01 (9th Cir. 1990).

### 2.   Analysis

Intellectual Disorder is one of the listed impairments considered in Step Three of the disability evaluation process and "is based on the three elements that characterize intellectual disorder: significantly subaverage general intellectual functioning; significant deficits in current adaptive functioning; and the disorder manifested before age 22."  <u>See</u> 20 C.F.R. Pt. 404, Subpart P, Appendix 1, § 12.00B(4).  For claimants capable of participating in standardized testing of intellectual functioning, this Listing is satisfied by meeting three requirements:

1. Significantly subaverage general intellectual functioning evidenced by a or b:

a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

a. Understand, remember, or apply information (see 12.00E1); or

b. Interact with others (see 12.00E2); or

c. Concentrate, persist, or maintain pace (see 12.00E3); or

d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 CFR Part 404, Subpart P, Appendix 1, § 12.05B.

In a brief submitted to the agency in advance of the hearing before the ALJ, Plaintiff specifically argued that she met the requirements of Listing 12.05B. (See AR at 175.) In support, Plaintiff pointed to: (1) Plaintiff's FSIQ score of 67 in Dr. Alasantro's evaluation, (2) the onset of Plaintiff's Kisbourne syndrome at 13 months and subsequent significant deficits while she was in school, as well as (3) "significant deficits in adaptive functioning." (Id.) Furthermore, Plaintiff's counsel discussed the discrepancy between Dr. Alasantro and Dr. Pasek's FSIQ scores during the hearing before the ALJ. (See id. at 55-56 (discussing the discrepancy and borderline nature of both scores).)

1     The ALJ did not, however, discuss Listing 12.05 in his decision.  (See generally id.

2   at 18-19.)  Instead, the ALJ considered whether Plaintiff met the requirements of other

3   listings in 20 C.F.R. § Pt. 404, Subpart. P, App. 1, § 12.00, including Listings 12.04

4   (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive

5   disorders), and 12.11 (neurodevelopmental disorders).  (See id.)  In addressing these

6   impairments, the ALJ considered three out of four of the Paragraph B criteria for each

7   entry, concluding that Plaintiff had only a moderate limitation in her ability to (1)

8   understand, remember, or apply information, (2) interact with others, and (3) concentrate,

9   persist, or maintain pace.  (See id. at 18-19.)  Furthermore, the ALJ did not mention Dr.

10   Alasantro's FSIQ score, only noting Dr. Pasek's FSIQ score of 72 in the part of his

11   decision discussing Plaintiff's RFC.  (See id. at 21 ("the claimant achieved a full scale IQ

12   score of 72, which is in the borderline range of intellectual functioning.").)

13     The omission of any discussion as to whether Plaintiff met the requirements of

14   Listing 12.05 from the ALJ's decision creates several problems that—in the Court's

15   view—require remand for further consideration as to whether Plaintiff meets the criteria

16   of that listing.  As an initial matter, courts within the Ninth Circuit have found that an

17   ALJ's failure to address a listing a claimant specifically argues is met at the

18   administrative level, constitutes reversible error in and of itself.  See, e.g., D.T. v.

19   Kijakazi, Case No. 22-cv-07245-SVK, 2023 WL 6852505, at *7 (N.D. Cal. Oct. 17,

20   2023) (citing Thresher v. Astrue, 283 F. App'x 473, 475 (9th Cir. 2008); Santiago v.

21   Barnhart, 278 F. Supp. 2d 1049, 1058 (N.D. Cal. 2003)) ("[the ALJ's failure to address

22   Listing 12.05] constitutes reversible error, because Plaintiff argued at the administrative

23   level that his impairments meet or equal the requirements of Listing 12.05, thereby

24   requiring the ALJ to address that Listing."); Lisa O. L. v. Kijakazi, Case No. 20-cv-

25   02865-RMI, 2022 WL 612803, at *7-8 (N.D. Cal. Mar. 1, 2022) (concluding that remand

26   for further consideration of whether the requirements of Listing 12.05 was necessary

27   when the plaintiff advanced evidence that she met Listing 12.05 and the ALJ did not

28   reference the listing in her decision).  Defendant quotes Gonzalez in arguing that an ALJ

is not required to definitively state "'why a claimant failed to satisfy every different section of the listing of impairments.'"  (See J. Mot. at 10 (quoting 914 F.2d at 1201.) Multiple courts within the Ninth Circuit have concluded, however, that <u>Gonzalez</u> does "not excuse an ALJ from discussing a specific relevant listing."  <u>Glass v. Astrue</u>, No. 3:12-cv-00627-AC, 2013 WL 4496500 at *8 (D. Or. July 29, 2013); <u>see also</u> <u>Kestner v. Colvin</u>, No. C 13-04747 LB, 2014 WL 5517787 at *23 (N.D. Cal. Oct. 31, 2014) (distinguishing from <u>Gonzalez</u> because "the ALJ failed to justify a decision that [plaintiff's] impairments did not meet the most obvious and relevant listing.").  Because meeting the criteria of Listing 12.05 would conclusively determine that Plaintiff was disabled and Plaintiff specifically addressed this listing in his brief to the agency in advance of the hearing before the ALJ, the Court concludes that the ALJ's failure to address the listing in his decision amounts to reversible error.

To be sure, the ALJ's failure to address Listing 12.05 could constitute harmless error if other parts of the decision provide sufficient reasons to conclude that Plaintiff's impairments do not meet or medically equal the listing's requirements.  <u>See, e.g.</u>, <u>Ojeda v. Saul</u>, Case No. 19-cv-02415-VKD, 2020 WL 5944434, at *4 (N.D. Cal. Oct. 7, 2020) ("Because the record reflects that [the plaintiff's] spine disorder did not satisfy all requirements of Listing 1.04A for the necessary duration, the ALJ's error in failing to provide an adequate explanation of his analysis at step three was harmless.").  Here as well, however, the ALJ's decision does not provide an appropriate level of reasoning for the Court to properly evaluate whether Plaintiff ultimately fails to meet the criteria for Listing 12.05.  In determining whether Plaintiff met the requirements of Listings 12.04, 12.06, and 12.11, the ALJ considered the Paragraph B criteria for each entry and found that Plaintiff had only moderate limitations in three of the four broad areas of functioning.  (See AR at 18-19 (finding a moderate limitation in Plaintiff's abilities to understand, remember, or apply information; interacting with others; and concentrating, persisting, or maintaining pace).)  These Paragraph B functional are identical to ones considered under Listing 12.05(B)(2) and could be used to determine that Plaintiff does

not satisfy the requirements under that listing.  <u>Compare</u> Listing 12.05B(2) (requiring an extreme limitation in one, or marked limitations in two of the abilities to (1) understand, remember, or apply information, (2) interact with others, (3) concentrate, persist, or maintain pace, or (4) adapt or manage oneself), <u>with</u> Listings 12.04(B), 12.06(B), and 12.11(B) (same); <u>see also</u> <u>D.T.</u>, 2023 WL 6852505, at *7 (citing <u>Turner v. Berryhill</u>, 705 F. App'x 495, 498 (9th Cir. 2017)) (concluding that Listing 12.05 was not met despite its omission from the ALJ's decision because the ALJ determined that the plaintiff did not meet the Paragraph B criteria of other listings, which were identical to the functional limitations that must be evaluated under Listing 12.05(B)(2)).  Absent from the ALJ's discussion, however, is any mention of the last functional area, the ability to adapt or manage oneself.  (<u>See generally</u> AR at 18-19 (discussing three out of four of the Paragraph B functional requirements).)  Although there is evidence throughout the record about Plaintiff's intellectual functions that could be used to evaluate this criterion, there is no discussion whatsoever within the ALJ's decision as to how any of this might affect Plaintiff's ability to adapt or manage herself, particularly in a work setting.  (<u>See generally</u> <u>id.</u>)  Accordingly, any conclusions that the Court *might* be able to make about the degree of limitation that Plaintiff experiences in this functional area would essentially be independent findings of fact that do not exist in the ALJ's decision.  <u>See, e.g.</u>, <u>Amber M. o.b.o. Linda A.M.</u>, Case No. 2:20-cv-05367-AFM, 2022 WL 952174, at *5 (C.D. Cal. Mar. 29, 2022) (citing <u>Ontiveros v. Astrue</u>, No. CV 10–4215–PLA., 2011 WL 1195935, at *4 (C.D. Cal. Mar. 30, 2011)) ("The ALJ's failure to adequately evaluate whether Plaintiff's impairments met or medically equaled Listing 11.14 warrants a remand.").  That is not the Court's role in reviewing an agency decision.  <u>See</u> <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 492 (9th Cir. 2015) ("A reviewing court may not make independent findings based on the evidence before the ALJ to conclude that the ALJ's error was harmless.").

Similar reasons leave the Court with insufficient information to evaluate the ALJ's consideration of Plaintiff's IQ scores within the record.  Defendant argues that any

conflict between Dr. Alasantro's FSIQ score of 67—one that appears to meet part of the required criteria under Listing 12.05B—and Dr. Pasek's FSIQ score of 72 "was for the ALJ to resolve," and points out that that agency policy generally favors the use of the most recent programmatically acceptable IQ test.  (See J. Mot. at 9 (citing Ford v. Saul, 950 F.3d 1141, 1149 (9th Cir. 2020); Program Operations Manual System ("POMS") DI 24583.055C-D[4]).)  The problem with these arguments, however, is that the ALJ's decision itself does not address or engage in any meaningful way with Dr. Alasantro's evaluation such that the Court can determine whether the ALJ resolved the conflict between both evaluations in favor of Dr. Pasek's.  (See generally AR at 18-19 (no mention of either FSIQ score or mental evaluation).)  Courts within the Ninth Circuit have routinely concluded that while an ALJ is entitled to reject or find an IQ score invalid for a multitude of reasons, those reasons must be explicitly stated in the ALJ's decision. See, e.g., Rodgers v. Colvin, Case No.: 1:16-cv-00544-BAM, 2017 WL 4004166, at *5 (E.D. Cal. Sept. 12, 2017) ("while the ALJ was permitted to find an IQ sore invalid for the reasons stated by Defendant, the ALJ must do so explicitly by stating her reasons on the record."); Dorothy D. v. Saul, No. 1:20-cv-03014-MKD, 2020 WL 5745805, at *4 (E.D. Wash. Aug. 10, 2020) (citing Gomez v. Astrue, 695 F. Supp. 2d 1049, 1056 (9th Cir. 2010)) ("An ALJ may only reject an IQ score for specific and legitimate reasons."); Young v. Saul, Case No. 19-cv-01965-PJH, 2020 WL 3506805, at *21 (N.D. Cal. June 29, 2020) ("even assuming an ALJ can use observations from the record to disregard an objective assessment, the ALJ did not cite specific instances in the record to discount such a test.").  Moreover, the POMS itself notes that an ALJ "must consider the extent to which intelligence test results support their determination whether a mental impairment meets or medically equals a listing in the context of the *entire medical record*."  DI

---

[4] The POMS is also available to be viewed online: https://secure.ssa.gov/poms.nsf/lnx/0424583055 (last visited January 11, 2024).  Defendant concedes that the POMS is not binding authority for the purposes of deciding which IQ test the ALJ should rely on.  (See J. Mot. at 9.)

24583.055I (emphasis added).  The ALJ made no mention of either IQ test in his step three analysis, only noting Plaintiff's FSIQ score of 72 under Dr. Pasek's evaluation in determining Plaintiff's RFC.  (See AR at 21.)  Both tests appear to be programmatically acceptable and were administered within six months of each other.  See POMS DI 24583.055 (noting that IQ tests are considered current if they are, *inter alia*, administered by a qualified psychologist after the claimant turns sixteen years old).  Any attempt to justify why the ALJ ignored Dr. Alasantro's FSIQ score would accordingly require the Court to rely on reasoning that is not present in the ALJ's decision itself.  See Anthony v. Colvin, No. EDCV 13–1658 SS., 2014 WL 3792780, at *3 (C.D. Cal. July 31, 2014) (concluding that remand was necessary when the ALJ "did not address whether [the plaintiff's] impairments met or equaled [Listing 12.05] on the ground that she did not achieve a valid verbal, performance, or full scale IQ of 60 through 70.").

In sum, the failure to address Listing 12.05 at step three creates a gap in the ALJ's decision that the Court cannot overlook.  The record contains an FSIQ score (Dr. Alasantro's) which appears to be programmatically acceptable (see AR at 272-85) and meets the requirements of Listing 12.05(B)(1), as well as evidence that the disorder leading to Plaintiff's diminished intellectual capacity began prior to her attainment of age twenty-two under Listing 12.05(B)(3).  (See AR at 288 (Kinsbourne's disease diagnosis at thirteen months).)  Furthermore, Plaintiff specifically argued that she had deficits in adaptive functioning under the areas required by Listing 12.05(B)(2) at the administrative level.  (See id. at 172-75.)  The ALJ's decision did not address any of this evidence in the context of Listing 12.05, and the parts that could be applied to an analysis of whether Plaintiff met that listing—the Paragraph B criteria under Listings 12.04, 12.06, 12.11— did not address whether Plaintiff had any impairments in the area of adapting and managing oneself.  (See generally AR at 18-19.)  Because meeting the criteria of Listing 12.05 would provide an independently sufficient basis for finding Plaintiff disabled, remand for clarification and further record development is unavoidable so that the ALJ can articulate "'precisely what was decided and why.'"  Lisa O. L., 2022 WL 612803, at

*8 (quoting <u>Thresher</u>, 283 F. App'x at 474).  Accordingly, the Court **RECOMMENDS** that this case be remanded for further development of the record as to whether Plaintiff's impairments meet or medically equal the requirements of Listing 12.05.

**B.    The ALJ's Paragraph C Analysis at Step Three**

      **1.    Parties' Arguments**

Next, Plaintiff argues that the ALJ also failed to properly address the Paragraph C criteria under Listings 12.04 and 12.06 at step three.  (<u>See</u> J. Mot at 11 ("The ALJ failed to address paragraph C of the Mental Adult Listings.").)  In addressing the Paragraph C criteria under these listings—which are alternatives to the Paragraph B criteria required to consider some listed impairments—Plaintiff contends that the ALJ used only "[boilerplate] language to explain why [Plaintiff's] psychiatric background does not meet paragraph C."  (J. Mot. at 15.)  Accordingly, Plaintiff argues that any conclusion by the ALJ ignores evidence of a "serious and persistent impairment[,]" including a history of special education accommodations, difficulty functioning in daily life, and professional problems, especially in dealing with superiors.  (<u>See</u> J. Mot. at 13.)  In citing to specific parts of the record in support of these arguments, Plaintiff specifically references Dr. Alasantro's report discussed above in Section VI.A.2., <u>supra</u>, which explains that she experienced a disruption in her developmental sequence and notes that she has a learning disability.  (<u>See</u> <u>id.</u> (citing AR at 274).)

Without contesting that the ALJ's evaluation of the Paragraph C criteria was boilerplate, Defendant urges the Court to conclude that the complete record, including Dr. Alasantro's report, does not establish that the Paragraph C criteria are met with respect to Listings 12.04 and 12.06.  (<u>See</u> J. Mot. at 13-15 (citing <u>Kitchen v. Kijakazi</u>, 82 F.4th 732 (9th Cir. 2023).)  Referencing the ALJ's decision that addressed Plaintiff's RFC, Defendant contends that "Plaintiff cites nothing" demonstrating the exacerbation of Plaintiff's symptoms with changes in her environment, and that the ALJ's decision contrasted Dr. Alasantro's report with other normal findings in the record.  (<u>See</u> J. Mot. at 14 (citing AR at 21).)  Defendant contends that the ALJ's decision that the Paragraph C

criteria were not met was therefore supported by substantial evidence.  (See J. Mot. at 15.)

### 2.    Applicable law

"The paragraph C criteria are an alternative to the paragraph B criteria under listings 12.02, 12.03, 12.04, 12.06, and 12.15."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(G)(1).  "To satisfy the paragraph C criteria, a claimant must show that her mental impairment(s) has existed for at least two years, and that (1) she relied 'on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of [her] mental disorder,'[5] and (2) despite her diminished symptoms and signs of her mental disorder, she has achieved only 'marginal adjustment,' meaning 'minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life.'"[6]  Jessica B., 2019 WL 850954, at *5 (quoting id. § 12.00(G)(2)(b)-(c)).

---

[5] The regulations provide that for the C(1) criteria, the agency will consider:

> that you receive ongoing medical treatment when the medical evidence establishes that you obtain medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for your medical condition. We will consider periods of inconsistent treatment or lack of compliance with treatment that may result from your mental disorder. If the evidence indicates that the inconsistent treatment or lack of compliance is a feature of your mental disorder, and it has led to an exacerbation of your symptoms and signs, we will not use it as evidence to support a finding that you have not received ongoing medical treatment as required by this paragraph.

20 C.F.R. Pt. 404, Subpart P, Appendix. 1 § 12.00(G)(2)(b).

[6] The regulations note that a "marginal adjustment" means that:

> your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become

23cv326-GPC(LR)

### 3.    Analysis

In evaluating whether Plaintiff met the Paragraph C requirements of Listings 12.04 and 12.06, the ALJ stated:

> The record does not establish that the claimant had only a marginal adjustment, that is a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life.   Further, there is insufficient evidence to establish that the claimant's medical disorder(s) were "serious and persistent."   In particular, there is insufficient evidence to establish that the claimant had a medically documented history of the existence of the disorder(s) over a period of at least 2 years, with evidence of both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that was ongoing and that diminished the symptoms and signs of the mental disorder(s); and (2) marginal adjustment or minimal capacity to adapt to changes in the environment or to demands that were not already part of the claimant's daily life.   Specifically, the evidence fails to show that, despite the claimant's diminished symptoms and signs, the claimant achieved only marginal adjustment.   The evidence further fails to show that changes or increased demands have led to exacerbation of the claimant's symptoms and signs and to deterioration in the claimant's functioning.   Accordingly, the evidence fails to satisfy the "paragraph C" criteria.

(AR at 19.)

In reaching the finding that Plaintiff failed to meet the Paragraph C criteria with

---

> unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. Pt. 404, Subpart P, Appendix. 1 § 12.00(G)(2)(c).

respect to the relevant listings, the ALJ failed to reference or discuss any medical evidence in the record.  (See generally id. at 18-19.)  This is precisely the type of conclusory and boilerplate language that the Ninth Circuit has repeatedly cautioned against.  See Lewis, 236 F.3d at 512; Marcia, 900 F.2d at 176.  Further still, district courts within the Ninth Circuit have routinely concluded that the failure to meaningfully engage with the medical evidence at step three, in combination with similar boilerplate language is an independent basis for remand.  See, e.g., Jamie S. v. Kijakazi, No. 2:21-cv-00084-SMJ, 2022 WL 1491668, at *6 (E.D. Wash. May 11, 2022) ("The Court therefore cannot meaningfully evaluate whether the ALJ's finding is supported by substantial evidence, and the Court will remand this matter with instructions to reevaluate whether Plaintiff's mental impairments establish the paragraph C criteria for Listings 12.04 and 12.06."); Katherine M. v. Kijakazi, Case No. 21-cv-01207-JST, 2022 WL 19975282, at *7 (N.D. Cal. Nov. 23, 2022) (quoting J.A. v. Kijakazi, No. 20-cv-07142-VKD, 2022 WL 2181693, at *14 (N.D. Cal. June 16, 2022)) ("the ALJ's failure to explain this conclusion 'leaves the Court to guess why the . . . record was not sufficient to satisfy C1 and C2'[.]").

In any event, to the extent that the Court is left to independently evaluate whether the record supports the ALJ's conclusion, Defendant's argument that there is a lack of supporting evidence for both Paragraph C criteria is insufficient.  The ALJ's own decision and the record demonstrate that: (1) Plaintiff's mental disorders have existed for more than two years, (see AR at 21 (noting that Plaintiff reported being prescribed psychotropic medications for three years); 221 (Plaintiff reported being prescribed Paroxetine for over twenty years for anxiety)), (2) she had received mental health therapy (See AR at 273 (noting that Plaintiff presented for a "neurophysical evaluation with neurocognitive (i.e., attention, multitasking), psychiatric (i.e., depression, anxiety), and physical (i.e. visual perceptual problem) complaints."); 20 (noting that Plaintiff reported being in the process of looking for a mental health provider that was covered by her insurance and that she had seen mental health providers in the past)), (3) she needed

accommodations in school, as well as in interacting with supervisors and performing daily tasks like managing money, (see AR at 274 (noting difficulties interacting with others in the workplace and that she would need to report to a single, understanding manager for individualized assistance); 400 (noting that Plaintiff reported difficulty staying employed due to anxiety issues and that she needs assistance from her grandmother in managing her finances); 43 (noting that she attended special education classes throughout her primary education and needed help from her mother to complete a childcare certificate at a community college)), and (4) that she struggled with irritability and memory problems during psychological testing.  (See AR at 400, 278.)

Defendant contends that Plaintiff fails to cite any evidence "showing that changes or increased demands [] led to exacerbation of [Plaintiff's] symptoms and signs to deterioration in her functioning," noting that psychiatric examinations by Doctors Clancy and Bradly found "no deficits," and that Dr. Pasek's examination concluded that Plaintiff's activities of daily living were "not significantly affected by mental impairment."  (J. Mot. at 14-15.)  This argument, however, highlights the problem posed by the lack of any reasoning in the ALJ's decision as to Paragraph C requirements in the first instance.  It is unclear to the Court how daily activities such as dressing, bathing, household tasks, and spending time with family have anything to do with changes in Plaintiff's environment that she must adapt to.  See Plas v. Comm'r of Soc. Sec. Admin., No. CV 20-00286-TUC-DCB (LAB), 2021 WL 3668380, at *5 (D. Ariz. June 22, 2021) ("Plas's activities of daily living and pet care are not 'changes' in his environment to which he must adapt.  They are the norm for his lifestyle."), report and recommendation adopted, 2021 WL 3163790 (D. Ariz. July 27, 2021).  Likewise, while the ALJ repeatedly noted that Plaintiff demonstrated "no deficits" and "fairly normal mental status" during psychiatric evaluations (see, e.g., AR at 21-22), there is nothing in the decision itself to indicate how these findings relate to Plaintiff's ability to adapt to changes in her environment or whether such changes would lead to an exacerbation of her symptoms.  See Plas, 2021 WL 3668380, at *6 ("Without more, the court cannot

conclude that the ALJ thought Plas's 'normal mental status with minimal treatment' was evidence that he has more than 'minimal capacity to adapt to changes in [his] environment or to demands that are not already part of his daily life.'") (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(G)(2)); see also J.A., 2022 WL 2181693, at *14 (N.D. Cal. June 16, 2022) ("The ALJ's failure to explain his Paragraph C determination again leaves the Court to guess why the longitudinal record did not suffice to satisfy C1 and C2."). Accordingly, the Court concludes that the ALJ's failure to adequately explain his Paragraph C determination renders it unsupported by substantial evidence. Because meeting the Paragraph C criteria could result in a determination that Plaintiff meets a listed impairment at step three, remand for clarification and further record development as to these criteria is similarly unavoidable so that the ALJ can articulate "'precisely what was decided and why.'" Lisa O. L., 2022 WL 612803, at *8 (quoting Thresher, 283 F. App'x at 474). The Court accordingly **RECOMMENDS** that this case be remanded for further development of the record as to whether Plaintiff meets the Paragraph C requirements of Listings 12.04 and 12.06.[7]

## C. The ALJ's RFC Determination

### 1. Parties' Arguments

Plaintiff also contends that the ALJ improperly evaluated her RFC by failing to address her "combination of physical and mental impairments." (J. Mot at 18.) Citing to 20 C.F.R. § 404.1529(d) and Social Security Ruling ("SSR") 85-16, Plaintiff contends that because she has both a "mental and physical limitation her RFC must include the

---

[7] The Court notes that its conclusions regarding the ALJ's analysis at step three are not a finding as to whether Plaintiff has satisfied any of the listings identified in 20 C.F.R. Pt. 404, Subpart P, Appendix 1. See, e.g., Smith-Grube v. Kijakazi, Case No. 2:21-cv-01574-BNW, 2022 WL 2072573, at *5 (D. Nev. June 8, 2022) ("Importantly, the Court is not finding that Plaintiff has (or has not) satisfied any Listing, including Listing 1.04(A). The Court only finds that because the ALJ did not sufficiently explain his step-three findings (at any point in his decision), he erred.") The Court only concludes that because the ALJ did not sufficiently explain his step three findings in any part of the decision as a whole, that part of the decision amounts to harmful error that must be corrected on remand.

23cv326-GPC(LR)

combination of impairments." (Id. at 20; see also id. at 16.)  Although it is difficult to follow Plaintiff's arguments in this section of the Joint Motion, as best as the Court can tell, Plaintiff contends that the ALJ: (1) failed address how her mental impairments—namely her Kinsbourne disease—affect her physical abilities, which resulted in a fall and subsequent shoulder damage (see J. Mot. at 16-17), and (2) inappropriately relied on medical opinions by Sophia Bradley, D.O. and John Clancey, D.O., which were not inconsistent with Dr. Alasantro's evaluation related to her cognitive limitations (discussed above in Section VI.A.2., supra).  (See id. at 17-18).

In response, Defendant argues that the ALJ appropriately addressed Plaintiff's physical and mental impairments in his RFC determination.  (See id. at 18-19.)  Specifically, Defendant notes that that the ALJ "found that Plaintiff's right shoulder impairment, together with her other impairments, limited her to the [RFC] for medium work . . . with additional limitations," and that Plaintiff does not point to any evidence that she would need more restrictive physical limitations than those found by the ALJ.  (Id. at 19.)  With respect to Plaintiff's mental limitations, Defendant further argues that while Plaintiff might disagree with the mental and social limitations in the RFC, Plaintiff likewise does not point to any evidence that would necessitate different mental limitations than the ones assessed by the ALJ.  (See id. at 20.)

## 2.    Relevant factual background

Relevant to Plaintiff's arguments about the ALJ's RFC determination, the Court summarizes the evidence in the record as follows.  An admission note by Tara L. Clancy, D.O., at Tri-City Medical Center on August 23, 2018 explains that Plaintiff was seen by the emergency department on August 18, 2018, for a fracture dislocation of the right shoulder after she slipped and fell, hitting her shoulder on a wall.  (See AR at 392.)  Dr. Clancy noted in a "past medical history" section of her evaluation that Plaintiff was "remarkable for a virus at age 13 [sic], causing inflammation of the cerebellum which apparently resulted in a developmental delay."  (Id.)  Plaintiff's shoulder injury was assessed by the emergency department, and follow-up imaging confirmed the injury to be

a "standard anterior dislocation of the shoulder." (Id. at 387.)  Plaintiff's injury was treated with surgery on August 24, 2018 by Dr. Andrew Hartmann, the medical center's shoulder specialist.  (See id. at 385, 391.)  A note by Andrew Fischer, M.D. during Plaintiff's treatment at Tri-City medical center explains that:

> [Plaintiff] has a history of anxiety depression, presents with right shoulder pain acute onset sharp severe worse with any kind of palpation movements constant no alleviating factors not associated with any paresthesias.  Symptoms started acutely after patient tripped on a curb at the beach.  Symptoms associate with bony deformity patient also hit her head and sustained a bruise to her right forehead however had no loss of consciousness, no nausea vomiting or vision changes.

(Id. at 383.)

A May 7, 2020 encounter note by Sophia Bradley, D.O. at Scripps Health explains that Plaintiff presented for a telehealth visit to discuss her anxiety.  (See id. at 323.)  The encounter note explains that Plaintiff has a "learning disability, history of acute cerebellar ataxia at 13 months old, slowed development," and that Plaintiff was "euthymic, makes good eye contact, [and] answers questions appropriately" during the examination.  (Id. at 324.)  Dr. Bradley assessed that Plaintiff should continue her prescription of Paxil and referred Plaintiff for a psychiatric specialist evaluation.  (See id.)

A January 8, 2021 encounter note by John Clancy, D.O., explains that Plaintiff presented for a refill of Paroxetine.  (See id. at 377.)  Dr. Clancy described the encounter as Plaintiff's first visit in over two years and noted that Plaintiff was diagnosed with "Kinsbourne syndrome as a child" and assessed that Plaintiff would need a refill of Paroxetine for "[m]oderate major depression."  (Id. at 377-81.)  The encounter note explains that Plaintiff had a normal mood and affect, was oriented to time, place, and person.  (See id. at 380.)

### 3.  Applicable law

If a claimant's impairments do not meet or equal a listed impairment at step three, the ALJ will then assess the claimant's RFC.  See 20 C.F.R. § 404.1520(e).  An RFC "is

an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  In determining a claimant's RFC, "an ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms . . . that are reasonably attributed to a medically determinable impairment.'"  <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 883 (9th Cir. 2006); <u>see also</u> 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  Careful consideration must be given to "any evidence about symptoms, 'because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone.'"  <u>Robbins</u>, 466 F.3d at 883 (citing SSR 96–8p).

**4.    Analysis**

In assessing Plaintiff's RFC, the ALJ referenced record evidence concerning both Plaintiff's physical and mental limitations.  Notably, with respect to Plaintiff's shoulder injury, the ALJ explained that:

> The medical records revealed the claimant sustained an injury to her shoulder resulting in an open complete fracture of the right humeral head in August 2018.  [AR at 387-88] and an open reduction internal fixation to repair the right shoulder fracture [AR at 392].  Following surgery, the fracture healed well and the claimant completed physical therapy [AR at 335].  Though she had limited use of left and limited end range of motion . . . of the right shoulder in April 2019 [AR at 339], in February 2021, the claimant was not in acute distress and showed no musculoskeletal deficits [AR at 390].

(AR at 20-21.)  The ALJ concluded later in his decision that:

> In light of the claimant's right shoulder fracture, improvement several years after surgery, and the claimant's testimony that she has difficulty reaching overhead with the right arm, the undersigned finds the claimant is capable of performing work at the medium exertional level and can frequently reach overhead with the right upper extremity.

(AR at 22.)

26

With respect to Plaintiff's mental impairments, the ALJ focused mainly on the mental status examinations and reports of Plaintiff's daily activities within the medical opinions in the record.  (See AR at 20-24.)  In pertinent part, the ALJ contrasted Dr. Alasantro's findings with those of Doctors Bradley and Clancy, noting:

> Mentally, the claimant reported having anxiety and depression and having difficulty focusing, concentrating, comprehending, and getting along with others.  A one-time examination by neuropsychologist Dr. Alasantro revealed impaired performance in intellectual functioning, attention, language, visuospatial abilities, executive functions, and visual memory [AR at 273].  However, when examined by Dr. Bradley, several psychiatric examinations showed no deficits.  The claimant was euthymic, made good eye contact, and answered questions appropriately [AR at 324, 326].  Similarly, when seen by Dr. Clancy in February 2021, his psychiatric examination of the claimant was within normal limits [AR at 380].

(AR at 21.)  The ALJ also concluded—based primarily on her subjective complaints about difficulties focusing, comprehending, remembering, and getting along with others—that Plaintiff's symptoms warranted further limitations in addition to the ones normally assessed under the medium work RFC: "occasionally interacting with the general public; occasionally performing work-related, non-personal, non-social interaction with coworkers and supervisors; and performing jobs requiring only simple work-related decisions but can keep pace sufficient to complete tasks and meet quotas typically found in unskilled work."  (AR at 22.)

In large part, Plaintiff argues that the ALJ did not appropriately evaluate her physical limitations because they are created by the ataxia from her Kinsbourne's disease and manifest themselves concurrently with her cognitive limitations—requiring the ALJ to address these limitations in combination.  (See J. Mot. at 16-17 ("In this case [Plaintiff's] physical limitations are intertwined with her cognitive limitations . . . [t]he consequences of Kinsbourne's disease are an inability to control muscle movement."); see also id. at 20.)  Such arguments, however, rely on a misapplication of agency

guidance, regulations, and caselaw, and are unconvincing to the Court.  Plaintiff contends that 20 C.F.R. § 404.1529(d) "mandates that the ALJ discuss the effect of the combination of both physical and mental limitations together." (See J. Mot. at 16.)  That regulation, however, contains no requirement that an ALJ discuss mental and physical limitations in combination, or indeed whether they are interdependent on each other.  See generally 20 C.F.R. § 404.1529(d) ("we consider your symptoms, such as pain, to evaluate whether you have a severe physical or mental impairment(s), and at each of the remaining steps in the process.").  Furthermore, while SSR 85-16 notes that the ALJ should consider the factors laid out in 20 C.F.R. Pt. 404, Subpart P, Appendix 1, § 12.00, including "the ability to understand, to carry out and remember instructions and to respond appropriately to supervision, coworkers, and customary work pressures in a work setting" when evaluating a claimant's RFC, there is simply no requirement in that ruling that the ALJ discuss whether impairments are interrelated or dependent on each other in making an RFC determination.  Plaintiff's argument appears to be an attempt to impose the requirements of other steps in the sequential evaluation process on the ALJ's RFC determination.[8]  (See, e.g., J. Mot at 16 (citing Lester v. Chater, 81 F.3d 821, 829 (9th Cir. 1995).)  The cited authority that Plaintiff uses to argue that the ALJ must consider her impairments in combination, however, either discusses other steps in the sequential evaluation process, or attempts to analogize the instant ALJ's decision to cases in which pertinent evidence was ignored in its entirety.  Cf. Lester, 81 F.3d at 829 (discussing the

---

[8] The Court recognizes that, as practical matter, further discussion of the Paragraph B and Paragraph C requirements at step three could result in the ALJ's discussion of additional limitations in formulating Plaintiff's RFC.  This is because the ALJ's decision is missing any meaningful discussion of Plaintiff's ability to "adapt and manage oneself" under Paragraph B and how Plaintiff adapts to changes in her environment under the Paragraph C criteria for the evaluation of whether Plaintiff's impairments meet or equal a listing.  See Sections VI.A & B, supra.  A discussion of these functional areas could result in additional limitations that the ALJ will need to address in re-formulating Plaintiff's RFC.  See, e.g., Smith-Grube, 2022 WL 2072573, at *7 ("on remand, should the ALJ find that Plaintiff's medical evidence does not satisfy the requirements of a Listing at step three, the ALJ should continue the disability evaluation to steps four and five, including reconsidering Plaintiff's pain and symptom testimony as well as her RFC.").

requirement that the ALJ consider the combination of a claimant's impairments to determine whether they meet a listed impairment at *step three* of the sequential disability process); Beecher v. Heckler, 756 F.2d 693, 694-95 (9th Cir. 1985) (concluding that the ALJ erred when he ignored *all* pertinent psychological evidence in the record in formulating the claimant's RFC); (internal quotations omitted); see also Coleman v. Astrue, No. 07–CV–1722–JM (JMA), 2009 WL 861864, at *11 (S.D. Cal. Mar. 26, 2009) (quoting SSR 96-8P) ("'the limitations identified in the paragraph B and paragraph C criteria *are not an RFC assessment* but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.'"). Plaintiff fails to cite caselaw or other binding authority that would require the ALJ to discuss the interdependency or interaction of Plaintiff's physical and mental impairments in determining her RFC, and the Court declines to do so in this situation.

Independent from her contentions that the ALJ was required to consider her mental and physical impairments in combination, Plaintiff neither presents a developed argument nor cites to any evidence in the record demonstrating that the ALJ's decision failed to appropriately consider these impairments in determining her RFC. With respect to Plaintiff's shoulder impairments, the ALJ determined that Plaintiff's shoulder injury was a severe impairment at step two (see AR at 17), but reasoned that after her surgical treatment, the fracture healed well, and Plaintiff completed physical therapy. (See id. at 20-21.) The ALJ determined that although Plaintiff had some "limited end range of motion of the right shoulder in April 2019," her improvement several years after surgery demonstrated that she could perform medium work as defined by the regulations. (See id. at 21-22.) Apart from the conclusory argument that the "ALJ's finding she can perform medium work requiring her to occasionally lift 50 pounds is incongruent with her shoulder limitations," Plaintiff provides no other evidence indicating why the ALJ's RFC determination is improper with respect to Plaintiff's shoulder injury. (J. Mot. at 17.) This is an insufficient basis to find error in the ALJ's findings. See, e.g., Johnson v. Commissioner of Soc. Sec. Admin., Case No. 1:22-cv-01636-EPG, 2024 WL 115247, at

*2 (E.D. Cal. Jan. 10, 2024) (citing <u>Valentine v. Comm'r Soc. Sec. Admin.</u>, 574 F.3d 685, 692 n.2 (9th Cir. 2009)) (rejecting a challenge to an ALJ's RFC determination when the claimant did not include any argument as to what other physical limitations were warranted apart from the ones already listed in the RFC).

With respect to her mental impairments, Plaintiff faults the ALJ's citations to normal mental findings by Doctors Bradley and Clancy during their respective psychological examinations.  (<u>See</u> J. Mot. at 18.)  Although the nuances of these arguments are not entirely clear from the briefing, Plaintiff appears to contend that neither of these doctors' opinions actually contradict Dr. Alasantro's evaluation, which assessed impaired performance in intellectual functioning, attention, language, visuospatial abilities, executive functions, and visual memory.  (<u>See id.</u> ("Dr. Bradley's medical evaluation is consistent with Dr. [Alasantro's] evaluation.  Dr. John [Clancy] diagnoses [Plaintiff] with Moderate Major depression.  Neither of these evaluations were related to [Plaintiff's] cognitive limitations.  Neither of these evaluations contradict Dr. [Alasantro's] evaluation.").)  Yet again, however, Plaintiff does not offer any alternative or additional limitations that she contends the ALJ *should have* assessed instead of the ones listed in the decision.  <u>See</u> <u>Aragonez v. Comm'r of Soc. Sec.</u>, Case No. 1:23-cv-00723-EPG, 2023 WL 7527066, at *2 (E.D. Cal. Nov. 13, 2023) (finding no error in the ALJ's decision when the Plaintiff "[did] not point to any particular evidence that the ALJ overlooked or explain how that evidence, even if overlooked, would have changed the disability determination.").  Indeed, after acknowledging that Plaintiff's depression, anxiety, and neurocognitive disorders were severe impairments at step two, the ALJ assigned specific limitations related to Plaintiff's cognitive limitations, including occasionally interacting with the public, occasionally interacting with coworkers and supervisors, and performing jobs requiring simple work-related decisions.  (<u>See</u> AR at 22.)  The ALJ notably did not only rely on contemporaneous normal mental function observations by Doctors Clancy and Bradley in reaching his RFC determination.  (<u>See id.</u> at 21-22 (citing findings by Doctors Pasek and Gross)).  Furthermore, it is unclear to the

1  Court in any event how findings of normal mental functioning during Doctors Bradley

2  and Clancy's examinations in different areas of cognitive functioning assessed by Dr.

3  Alasantro would ultimately affect the limitations assessed by the ALJ.  Accordingly, the

4  Court concludes that the ALJ did not err in assessing Plaintiff's RFC.

5  **D.**    **The ALJ's Evaluation of Plaintiff's Subjective Symptom Testimony**

6      **1.**    **Parties' Arguments**

7      Finally, Plaintiff argues that the ALJ improperly rejected her testimony regarding

8  her subjective symptoms by failing to contradict statements she made during the

9  administrative hearing about the difficulties she experiences related to her cognitive

10  limitations.  (See J. Mot at 23:20-25.)  Specifically, Plaintiff points to parts of the

11  administrative hearing in which she discussed: (1) memory and comprehension issues

12  caused by her anxiety and depression, (2) problems getting along with coworkers,

13  supervisors, and the public in past jobs, and (3) problems that she has with managing

14  money.  (See id. at 21-23.)  Plaintiff contends that the ALJ's failure to contradict these

15  statements—which directly relate to her experience in the workforce—renders the ALJ's

16  findings unsupported by substantial evidence.  (See id. at 23:23-25.)

17      Defendant contends that Plaintiff's arguments fail to provide corroborating

18  evidence to contradict the ALJ's reasoning for discounting Plaintiff's subjective symptom

19  statements.  (See id. at 28:8-17.)  Specifically, Defendant cites to several portions of the

20  ALJ's decision, including: failure of the medical evidence to support Plaintiff's claims of

21  cognitive limitations (see id. at 24-26), the effectiveness of Plaintiff's conservative

22  treatment of her symptoms with medication (see id. at 26-27), inconsistencies between

23  Plaintiff's statements and other behavior noted in the record (see id. at 27-28), and her

24  activities of daily living undermining her allegations of disability.  (see id. at 27.)  These

25  elements, as Defendant argues, were sufficient for the ALJ to reject Plaintiff's subjective

26  symptom testimony.

27      **2.**    **Relevant factual background**

28      During the administrative hearing, the ALJ asked Plaintiff several questions related

31

23cv326-GPC(LR)

to her past work experience and mental impairments.  For instance, the ALJ discussed the reason that Plaintiff was fired from previous jobs:

[ALJ]: Why did you stop working at Coles Cottage?

[Plaintiff]: I, because of complaints.  I was told by the director that there were some complaints by the parents.  Now, I wasn't aware of anything.  She never told me, to warn me.  She just fired me on the spot.  I wasn't aware of any complaints because the parents didn't complain to me.  They always said I was doing a good job to my face.  I believe that it was a sabotage by another staff member, because they thought that I was doing—I believe they thought I was doing better than them, so to speak, and they didn't like it, and they didn't like my personality, so that's why-

. . .

[ALJ]: Why'd you get fired from Happy Times?

[Plaintiff]: I said something to a parent that wasn't appropriate that I thought was totally fine that I did it, and it wasn't out of anger or anything, but one of the other teachers heard me, and I shouldn't've said what I said, and I shouldn't've, so I, you know, so I—with my words sometimes, I know what I want to say in my head, but my words don't really correlate with that sometimes.  That's my brain thing.  So, they misunderstood what I was saying, and I tried to—would talk to the director about it, but she just said that the owner of the property, she didn't, but the owner of the property wanted to let me go because of it.

. . .

[ALJ]: And the firings stem around you saying inappropriate things, or is there other reasons why you were fired from those other jobs?

[Plaintiff]: I have a bit of a problem getting along with people, getting along with other staff.  They don't seem to, and I take responsibility for some things, but some things, a lot of things are my brain thing, that I know what I want to say in my head, and I get confused, and I ask questions more often than most

people do, just so I get it right, and then some people get annoyed with that and that's what usually happens to me. So yeah, that was—that's what usually happens to me, and I get really anxious. So, yes.

. . .

[Plaintiff]: Well, I have trouble with money also, and I've been looking for, like, you know, shelves, you know, stocking shelves that kind of thing. I went to a couple of different places, and I did have a job a long, many, many years ago, right after high school, it was. I worked at Kmart, and I was a cashier, and I'm— I got fired because I gave too much—too back—too much change back.

(AR at 36-40.)

Additionally, the ALJ discussed Plaintiff's mental impairments during the hearing. For instance, the ALJ asked about Plaintiff's accommodations in primary school and in obtaining a childcare certificate from Palomar college (see id. at 43), her ability to manage her finances (see id. at 43-45), her daily activities (see id. at 44-45), as well as how her mental impairments affect these activities. (See id. at 49-51.) Plaintiff noted that she had some issues with comprehension, maintaining focus, and understanding instructions from conversations with others. (See id. at 50-51.)

### 3.    Applicable law

The Ninth Circuit has established a two-part test for evaluating a claimant's allegations regarding subjective symptoms. See Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017), superseded by regulation on other grounds;[9] see also SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). First, the ALJ determines whether there is "objective

_____

[9] "[A]ssessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." Trevizo, 871 F.3d at 678 n.5 (quoting SSR 16-3p, 2016 WL 1119029).

medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged." Trevizo, 871 F.3d at 678 (quoting Garrison v. Colvin, 759 F.3d 995, 1014–15 (9th Cir. 2014)). Second, if a claimant presented such evidence, and there is no evidence of malingering, the ALJ may reject the claimant's statements about the severity of their symptoms "only by offering specific, clear and convincing reasons for doing so." Id.

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (internal quotation omitted). "[A]n ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of [their] residual functional capacity determination." Id. at 489. Instead, the ALJ must identify the testimony regarding the claimant's symptoms that the ALJ finds not credible, and explain what evidence undermines the claimant's testimony. See Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citations omitted); see also Burrell v. Colvin, 775 F.3d 1133, 1139 (9th Cir. 2014) (finding error where the ALJ "never connected the medical record" to the claimant's testimony, and did not make "a specific finding linking a lack of medical records to [the] [c]laimant's testimony about the intensity" of her symptoms); Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (providing that the ALJ's reasons for discounting a claimant's testimony must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony").

"Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ considers "all of the evidence presented," including information about the claimant's prior work record, statements about symptoms, evidence from medical sources, and observations by the Agency's employees and other individuals. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see SSR 16-3p, 2016 WL 1119029. In addition, the ALJ may consider other factors, such as Plaintiff's daily activities; the location, duration, frequency, and intensity of their pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness,

and side effects of any medication taken to alleviate pain; treatment; and any other measures used to relieve pain.  See id.

### 4.    Analysis

The ALJ found—and neither party contests—that Plaintiff has the following severe impairments: "[d]isplaced fracture of the right shoulder in 2018 status post open reduction and internal fixation; unspecified neurocognitive disorder; borderline intellectual functioning; anxiety disorder; and depression."  (AR at 17 (citing 20 C.F.R. § 404.1520(c)).)  Thus, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," satisfying the first prong of the subjective symptom inquiry test.  (Id. at 20.)  Furthermore, neither party alleges that the ALJ found that Plaintiff was malingering.  (See generally J. Mot.)  Accordingly, the Court must determine whether the ALJ provided specific, clear, and convincing reasons for discounting Plaintiff's claims regarding her symptoms.  See Brown-Hunter, 806 F.3d at 489.

The ALJ identified several reasons for discounting Plaintiff's claims about the effects of her mental impairments:[10] (1) that her symptom testimony was inconsistent with the medical evidence in the record (see AR at 21), (2) that her reports about her symptoms were inconsistent with evidence about the effectiveness of the treatments she received, particularly her providers' treatment of her symptoms with a medication called Paxil (see id.), (3) that her ability to obtain a childcare certificate from Palomar College suggested that she was not as limited as she alleged in her testimony (see id. at 21-22), and (4) that her claims were inconsistent with her testimony about her daily activities.  (See id.)

---

[10] Although Defendant presents several arguments as to why the ALJ's rejection of Plaintiff's physical symptoms were inconsistent with the record (see J. Mot. at 24-26), Plaintiff only argues that the ALJ's rejection of Plaintiff's mental symptoms was insufficient.  (See id. at 22-23 (discussing "cognitive limitations").)  Accordingly, the Court will only address the ALJ's discussion of Plaintiff's mental impairments.

### a.      The ALJ's evaluation of the medical evidence

One reason that the ALJ provided for discounting Plaintiff's subjective symptom testimony about her mental limitations was that the objective medical evidence in the record does not support Plaintiff's alleged symptoms.  (See id. at 20-21.)  Specifically, the ALJ noted that although Plaintiff reported that she had been diagnosed with anxiety in high school, had been prescribed psychotropic medications for several years, and experienced symptoms of sadness, fears, worries, irritability, and low memory, Plaintiff's mental status examination by Dr. Pasek demonstrated "no significant deficits." Highlighting some of the results from Dr. Pasek's assessment, the ALJ pointed out that:

> The claimant showed appropriate behavior and adequate eye contact [AR at 397].  She was respectful, cooperative, and pleasant and did not manifest abnormal movements, ticks, or tremors (id).  Her mood was consistent with the content of the conversation and her affect was appropriate to mood (id). Thought content and thought processes were normal (id). Memory was unimpaired because she was able to recall 3/3 designated words immediately and 2/3 words remotely, what she had for breakfast, the date and place of birth, and family history, simple calculations, and recite digit spans up to 6 forward and 4 backward (id).  Her attention span for answering interview questions and following test instructions was unimpaired (id). Her attention span for answering interview questions and following test instructions was unimpaired (id).  Insight and judgment were adequate [AR at 398-99].  Her fund of knowledge was intact [AR at 399]. On the WAIS IV, the claimant achieved a full scale IQ score of 72, which is in the borderline range of intellectual functioning (id).  Test results from WAIS IV and WRAT V indicated the claimant's borderline to low average range cognitive ability and adequate concentration and attention [AR at 400].

(Id. at 21.)

Additionally, the ALJ contrasted Plaintiff's reports of having "anxiety and depression," as well as her "difficulty focusing, concentrating, comprehending, and getting along with others" with other medical opinions in the record.  (See id.)  Although

1   Dr. Alasantro assessed impaired performance in intellectual functioning, attention,

2   language, visuospatial abilities, executive functions, and visual memory, the ALJ noted

3   that Doctors Clancy and Bradley assessed no deficits.  (See id.)

4          Plaintiff makes no argument disputing the ALJ's finding that the medical evidence

5   does not support her subjective symptom testimony.  Accordingly, the Court concludes

6   that the ALJ's reasoning regarding the lack of medical evidence through normal

7   examination findings, Plaintiff's behavior during the examinations, and discussing the

8   results of Dr. Pasek's intellectual function testing were specific, clear, and convincing

9   reasons for discounting Plaintiff's subjective symptom testimony about her ability to

10  concentrate and pay attention.  See, e.g., Laura C. v. Kijakazi, Case No. 2:22-cv-02861-

11  SP, 2023 WL 6304852, at *6 (C.D. Cal. Sept. 23, 2023) (noting that the ALJ provided a

12  sufficient reason for discounting the plaintiff's subjective reports related to concentration,

13  comprehension, and focus when mental status examinations noted that she had normal

14  memory, normal concentration, intact insight and judgment, and cooperative behavior);

15  Cox v. Berryhill, No. EDCV 17-0544-JPR, 2018 WL 2341752, at *17 (C.D. Cal. May 22,

16  2018) (concluding that the ALJ provided sufficient reasoning to discount subjective

17  symptom statements when the ALJ noted inconsistencies between the plaintiff's

18  complaints and the objective medical evidence and the plaintiff raised no argument

19  directly challenging this finding).

20                    b.    Improvement with treatment

21          The failure of the objective medical evidence to support Plaintiff's statements

22  about her symptoms related to her mental impairments was only one reason that the ALJ

23  provided for discounting this testimony in the record.  The ALJ provided additional

24  reasoning for discounting these statements by noting that Plaintiff reported improvement

25  of her impairments with treatment, namely through her continued Paxil prescription.

26  (See AR at 21 (citing id. at 324-25, 326, 337, 380-81) (noting that Plaintiff indicated that

27  "as she continued conservative treatment with Paxil . . . it helped with her mood and

28  anxiety").)  Plaintiff makes no argument disputing this finding, and the Court concludes

that the ALJ's references to her improvement with medication were additional specific, clear, and convincing reasons for discounting Plaintiff's subjective symptom testimony. See, e.g., Paul K. v. Comm'r, Soc. Sec. Admin., No. 6:19-cv-2028-MO, 2023 WL 8602150, at *3 (D. Or. Dec. 12, 2023) (concluding that the ALJ reasonably found that the plaintiff's symptoms were appropriately addressed by treatment of his symptoms with Paxil); Red v. Colvin, No. 2:15-CV-0069-TOR, 2016 WL 335868, at *4 (E.D. Wash. Jan. 27, 2016) (holding that evidence of improvement provided by the ALJ was sufficient when the plaintiff "makes no argument that ALJ's chosen examples from the record evidencing improvement with treatment do not demonstrate broader improvement").

### c.    Plaintiff's childcare certificate

Another reason that the ALJ cited in discounting Plaintiff's testimony about her symptoms was that she had earned a childcare certificate from Palomar College.  (See AR at 21-22 ("the claimant has reported, for example, that [she] suffers from [borderline intellectual functioning], and has difficulty comprehending, focusing, and remembering. However, she testified that she earned a childcare certificate from Palomar College").) While Plaintiff, yet again, makes no argument whatsoever disputing this finding, the record indicates that Plaintiff received this certificate in 2000—nearly twenty years before the alleged onset date of her disability.  (Compare AR at 259 (noting date of certificate completion in 2000), with id. at 17 (noting alleged onset date in 2020).) Defendant cites Johnson v. Colvin, 671 F. App'x 519, 520 (9th Cir. 2016) for the proposition that matriculating college classes is clearly inconsistent with an allegation that a claimant cannot work at all.  (See J. Mot. at 28:5-7.)  While participating in college classes at the same time a claimant alleges that they are disabled could certainly serve to undermine symptom testimony related to comprehending, focusing, and remembering, there is no discussion by the ALJ how Plaintiff receiving a childcare certificate twenty years before the onset of her alleged disability undermines her testimony that she has contemporaneous difficulty with comprehension, focus, and remembering information. See Natalie H. v. Comm'r of Soc. Sec. Admin., Civ. No. 6:22-cv-00529-CL, 2023 WL

5561218, at *5 (D. Or. Aug. 29, 2023) ("There is no other mention of Plaintiff taking classes after her alleged onset date.  Even if Plaintiff successfully completed these two classes, the ALJ does not explain how the occasional college class undermines her symptom testimony or translates to transferrable work skills.").  This finding by the ALJ is accordingly not supported by substantial evidence.

### d. Plaintiff's daily activities

Finally, the ALJ determined that Plaintiff's testimony about her daily activities was inconsistent with her alleged mental limitations involving her depression and anxiety symptoms.  (See AR at 21-22.)  In concluding that Plaintiff's daily activities were not affected despite her alleged impairments, the ALJ cited evidence that Plaintiff "could do personal care tasks, complete household tasks, pay bills and/or handle cash appropriately but with support from her grandmother, go out alone, make decisions, independently manage medications, spend her time walking, playing card games and visiting with family, and getting rides with her family."  (Id. at 21.)

Without further discussion by the ALJ as to precisely *how* these activities contradict Plaintiff's testimony about her mental impairments involving concentration, focus, or comprehension, these are insufficient reasons to discount Plaintiff's subjective symptoms.  Courts within the Ninth Circuit have routinely concluded that the mere fact that a claimant can carry out certain activities at home is not sufficient for an ALJ to conclude that these activities can transfer to a work environment.  See, e.g., Smith v. Saul, 820 F. App'x 582, 603 (9th Cir. 2020) ("many home activities are not easily transferrable to what may be the more grueling environment of the workplace . . .").  It is not clear to the Court how Plaintiff's abilities to perform personal care, complete household tasks, go out alone, make decisions at home, managing medications, spend time walking, playing card games, visiting with family, and getting rides with family, without any further inquiry into what skills these activities demonstrate, would require a level of concentration and attention such that they would contradict Plaintiff's testimony about her inability to comprehend conversations with superiors in the workplace, interact

appropriately with coworkers, or maintain steady employment.

One exception that—under different circumstances—might have swayed the Court's analysis of this part of the ALJ's decision is Plaintiff's ability to manage her own finances. Managing money could require enough attention or concentration such that the ALJ could have rationally concluded that this daily activity was inconsistent with Plaintiff's testimony about her limitations. Indeed, numerous courts within the Ninth Circuit have mentioned managing money as a daily activity that involves attention and concentration. See, e.g., Allen T. v. Saul, No. EDCV 19-1066-KS, 2020 WL 3510871, at *8 (C.D. Cal. June 29, 2020) ("The scope of the activities – various church activities, shopping, managing money, and painting [] – was inconsistent with Plaintiff's allegation that maintaining focus and concentration was a constant struggle."); Gitchell v. Comm'r Soc. Sec., No. 1:21-CV-00157-SAB, 2023 WL 1785914 at *10 (E.D. Cal. Feb. 6, 2023) ("even though Plaintiff alleged difficulty with focus and concentration, the record demonstrated Plaintiff had the ability to complete many activities of daily living, including . . . manag[ing] money"); Tristan v. Comm'r Soc. Sec. Admin., No. CV-20-02240-PHX-DWL, 2022 WL 1707953, at *6 (D. Ariz. May 27, 2022) ("For instance, the ALJ discussed that Plaintiff is able to engage in daily activities that require her to maintain concentration, persistence, and pace, such as with managing her finances, online shopping, and preparing meals."). The ALJ's discussion, however, notes that Plaintiff needed support from her mother and grandmother to pay her bills and manage her finances. (See AR at 21 ("pay bills and/or handle cash appropriately but with support from her grandmother"), 43 ("my mom helps me with my finances").) Accordingly, the Court is not convinced that the ALJ sufficiently discussed how Plaintiff's daily activities were inconsistent with her subjective symptom testimony. These findings were similarly unsupported by substantial evidence.

### e.    Conclusion

Although two of the reasons that the ALJ cited in discounting Plaintiff's subjective symptom testimony were unsupported by substantial evidence, any error was harmless

because the ALJ identified two other sufficient bases to conclude that Plaintiff's limitations were not as severe as she alleged them to be.  See, e.g., Paul K., 2023 WL 8602150, at *4 ("The ALJ's error was harmless, however, because he identified two other sufficient bases to discount Plaintiff's subjective symptom testimony.").  Notably, apart from a cursory contention that the ALJ failed to cite to record evidence which contradicts her statements, Plaintiff only argues that the ALJ should have discussed other specific work-related limitations she raised during the hearing.  (See J. Mot. at 23 (citing to Plaintiff's hearing testimony about her symptoms and noting that her statements "directly relate to her experience which is relevant to working.").)  This argument amounts to a request for the Court to assess the evidence that Plaintiff prefers to discuss, over multiple independent reasons that the ALJ used in discounting her subjective symptom testimony, without any discussion as to *how* the ALJ's stated reasons were invalid.  It is not the Court's purview to reassess evidence that is susceptible to more than one rational interpretation.  See Ludwig, 681 F.3d at 1051.  Accordingly, Plaintiff's arguments are insufficient for the Court to disturb the ALJ's findings regarding her subjective symptom testimony.

## VII.   REMAND

A reviewing court has discretion to remand an action for further proceedings or for a finding of disability and an award of benefits.  See, e.g., Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985) (decision of whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the reviewing court).  Whether an action is remanded for further proceedings or for an award of benefits depends on the likely utility of additional proceedings.  Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  In determining whether an award of benefits is warranted, the Court conducts the "three-part credit-as-true" analysis.  Garrison v. Colvin, 759 F.3d 995, 1020 (9th Cir. 2014).  Under this analysis the Court considers whether: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence; (2) the record has been fully developed and further proceedings would serve no useful purpose; and (3) if the improperly

41

discredited evidence is credited as true, the ALJ would be required to find the claimant is disabled on remand.  See Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015).

Even if all the requisites are met, however, a court may still remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled[.]"  Garrison, 759 F.3d at 1021.  "Serious doubt" can arise when there are "inconsistencies between [the claimant's] testimony and the medical evidence," or if the Commissioner "has pointed to evidence in the record the ALJ overlooked and explained how that evidence casts into serious doubt" whether the claimant is disabled under the Act.  Dominguez, 808 F.3d at 407 (quoting Burrell v. Colvin, 775 F.3d 1133, 1141 (9th Cir. 2014) (internal quotations omitted)).  The first requirement is met here based on the ALJ's harmful legal errors.  As discussed above, the ALJ erred in evaluating Plaintiff's impairments under the Listing of Impairments at step three.

As for the second requirement, the Ninth Circuit has held that remanding for further proceedings rather than an immediate payment of benefits serves a useful purpose where "the record has [not] been fully developed [and] there is a need to resolve conflicts and ambiguities."  Treichler v. Comm'r Soc. Sec. Admin., 775 F.3d 1090, 1101 (9th Cir. 2014) (internal quotations and citations omitted).  "When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits."  Leon v. Berryhill, 880 F.3d 1041, 1045 (9th Cir. 2018) (citing id. at 1099).  "The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court."  Trevizo v. Berryhill, 871 F.3d 664, 682 (9th Cir. 2017) (quoting Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987)).  The court concludes that the record is sufficiently ambiguous, making remand for an immediate payment of benefits inappropriate here.  The ALJ's failure to develop the record with respect to the Paragraph B and Paragraph C requirements under the Commissioner's Listing of Impairments, as well as the ALJ's failure to meaningfully consider the discrepancy between Plaintiff's IQ scores deprives the Court of the ability to determine whether his conclusions were supported by

substantial evidence.  Accordingly, this case should be remanded for further administrative proceedings to allow for proper consideration of the evidence of record and to conduct any further necessary proceedings.

The Court concludes that the "rare circumstances that result in a direct award of benefits are not present in this case." Leon, 880 F.3d at 1047.  Where—as happened here—the ALJ fails to properly evaluate the record with regard to a claimant's impairments, further administrative proceedings could remedy the ALJ's error, and remand is appropriate.  See, e.g., Nichole M. v. Comm'r, Soc. Sec. Admin., Case No. 2:22-cv-00645-MK, 2023 WL 2889777, at *8 (D. Or. Apr. 11, 2023) (concluding that remand was appropriate when the ALJ failed to consider whether the plaintiff met the criteria of a listing at step three).

## VIII.  CONCLUSION & RECOMMENDATION

For the reasons set forth above, the Court **RECOMMENDS** that the Commissioner's decision be **REVERSED** and this matter be **REMANDED** for further administrative proceedings consistent with this Report and Recommendation.

Additionally, **IT IS ORDERED** that no later than **February 16, 2024**, any part to this action may file written objections with the Court and serve a copy on all parties.  The document shall be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **February 23, 2024**.  The parties are advised that failure to file objections within the specified time may waive the right to raise these objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated:  February 2, 2024

_____

Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

23cv326-GPC(LR)